**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MATTHEW PAULS,
4 Logan Circle, Apt. 3
Washington, D.C. 20005,

Plaintiff,

v.

VINCENT POPPITI,
Fox Rothschild LLP
919 North Market Street, Suite 300
Wilmington DE 19899-2323,

Defendants.

Case No. __________

JURY TRIAL REQUESTED

## COMPLAINT

Plaintiff Matthew Pauls, by and through his undersigned counsel, brings this Complaint against Vincent Poppiti, and it support, thereof alleges the following:

## INTRODUCTION

1. Mr. Pauls is the 50% owner of Fernbank Partners LLC ("Fernbank Partners"), an investment management company that managed a small private investment fund, Fernbank LLC (the "Fund"). Between 2010 and 2014, Fernbank Partners successfully managed the Fund's assets, which grew steadily from less than $75,000 to more than $10 million.

2. In October 2014, a dispute arose between Mr. Pauls and the co-owner of Fernbank Partners, Alex Tabatabai. As a part of that dispute, an arbitrator determined that it was not reasonably practicable for Mr. Pauls and Mr. Tabatabai to continue carrying on the business of Fernbank Partners. In August 2016, the arbitrator appointed Defendant Honorable Vincent J. Poppiti to act as liquidating trustee for Fernbank Partners.

3. Defendant Poppiti accepted appointment as liquidating trustee for Fernbank Partners, and immediately *designated himself* to also act as liquidating trustee for the Fund. Defendant designated himself trustee for the Fund without any regard for the obvious conflict of interests that created with regard to the fiduciary duties that he owed Fernbank Partners.

4. Defendant Poppiti simultaneously hired the law firm where he is a partner, Fox Rothschild LLP to represent himself and the two Fernbank entities during the liquidation and arbitration.

5. Starting the moment he was appointed, Defendant Poppiti ignored the fiduciary duties he owed as the liquidating trustee of Fernbank Partners, and flagrantly breached those duties by making no effort to obtain any recovery for Fernbank Partners or its principals. To the contrary, Defendant Poppiti continually and actively worked against the interest of Fernbank Partners and its owners.

6. For example, Defendant Poppiti brought no claims and asserted no rights on behalf of Fernbank Partners at any point in the liquidation. To the contrary, Defendant Poppiti opposed recovery not only of the legal fees and expenses contractually owed to Fernbank Partners and its principals, but also the hundreds of thousands of dollars in management fees and incentive allocations earned by the millions of dollars that Fernbank Partners generated for Fund investors. In so doing, Defendant Poppiti earned for himself and his firm nearly $2 million in fees.

7. There were obvious and direct conflicts of interests between Fernbank Partners and the Fund that were repeatedly pointed out to Defendant Poppiti, but which he refused to address. Instead, Defendant Poppiti knowingly breached the fiduciary duties owed as the trustee to Fernbank Partners. Fernbank Partners, and by extension Mr. Pauls, lost millions in unpaid legal fees, management fees and incentive allocations as direct result of Defendant's breach of his fiduciary duties.

## JURISDICTION

8. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

## VENUE

9. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

10. Matthew Pauls is 50% owner and 50% manager of Fernbank Partners LLC a Delaware limited liability company with a principal place of business in Washington DC. Matthew Pauls was an investment manager for Fernbank Partners, which provided investment management services for the Fund between 2010 and 2014. Mr. Pauls resides in Washington DC.

11. Honorable Vincent J. Poppiti is a retired Delaware family court judge. He is a partner at the law firm Fox Rothschild LLP in their Wilmington, DE office. Upon information and belief, Defendant Poppiti resides in Delaware.

## FACTUAL ALLEGATIONS

### A. Fernbank Partners and The Fund

12. Mr. Pauls and Mr. Tabatabai founded Fernbank Partners in June 2010. Mr. Pauls and Mr. Tabatabai are the sole members and fifty percent co-owners of Fernbank Partners. Fernbank Partners is governed by a limited liability company operating agreement (the "Fernbank Partners' Operating Agreement").

13. Fernbank Partners' sole business was to be the managing member of the Fund, which is a private investment fund, also knowns as a hedge fund. The Fund raised capital by offering membership interest to qualified investors. The Fund is governed by its own limited liability company operating agreement (the "Fund Operating Agreement"). The relationship between Fernbank Partners and the Fund is governed by an Investment Management Agreement between the two entities (the "IMA").

14. The Fund members were passive investors. All decisions concerning the Fund were made by its manager, Fernbank Partners.

15. Specifically, Mr. Pauls developed and executed the Fund's investment strategies. Mr. Tabatabai, a lawyer, performed the in-house legal and tax work for Fernbank Partners and the Fund and attempted to raise capital for the Fund. Mr. Tabatabai had little to no input in the Fund's investment decisions or strategies.

16. Between 2010 and 2014, the Fund was small but rapidly growing. It grew from one initial member to a high of twenty-six members, and from less than $75,000 in assets under management, to more than $10 million.

17. Roughly half of the Fund's investors were friends and family of Mr. Tabatabai, accounting for roughly 50% of the Fund's assets. The Fund's largest investor, Cindy Kaiser, was Mr. Tabatabai's wife and held approximately 25% membership interest in the Fund.

18. As compensation for its management services, the Fund paid Fernbank Partners a quarterly management fee equal to 0.375% of the Fund's capital (1.5% annualized). Fernbank Partners also earned an annual incentive allocation equal to 15% of the profits earned on the Fund's investments. These management fees and incentive allocations were distributed to Fernbank Partners, then equally divided between the two Fernbank Partners owners – Mr. Pauls and Mr. Tabatabai.

19. Until October 2014, when Mr. Pauls was illegally removed from control of Fernbank Partners, the Fund was very successful under Fernbank Partners' management and delivered excellent returns to its investors. This success was attributable solely to Mr. Pauls' investment decisions. The annual returns generated by Mr. Pauls for the Fund out-performed the market by multiples.

20. Indeed, Defendant Poppiti commissioned, at significant expense to the Fund, an audited financial report for the Fund. That report grossly understated the Fund's returns, yet even that report concluded that Mr. Pauls earned the following annual returns for the Fund:

| | |
|---|---|
| July 2010 to Dec 2010 | 6.1% |
| 2011 | 12.6% |
| 2012 | 5.0% |
| 2013 | 40.9% |

| | |
|---|---|
| 2014 | 52.0%[1] |

21. These spectacular returns are neither exaggerated nor unsubstantiated. Rather they are the audited results of an accounting firm, Sandler & Co. ("Sandler"), hired at substantial cost to the Fund by Defendant Poppiti to recreate from scratch the Fund's financials. Even though Sandler, at Defendant Poppiti's instruction, used a set of accounting procedures that significantly understated the Fund's returns, it still concluded that Mr. Pauls' investment management skills earned, for example, over 40% returns for the Fund in 2013 and over 50% returns for the Fund in 2014. It is undisputed that the Fund's investors profited greatly from the skill, vision and perseverance of Mr. Pauls.

**B. Mr. Tabatabai Illegally Removed Mr. Pauls**

22. Prior to the start of fiscal year 2014, unbeknownst to Mr. Pauls, Mr. Tabatabai instructed the Fund's administrator to cease charging Mr. Tabatabai's wife, Cindy Kaiser, management fees. Starting with first quarter 2014, the administrator followed Mr. Tabatabai's instruction and did not charge Ms. Kaiser's Fund capital account any management fees in 2014. Because Ms. Kaiser was such a large investor in the Fund, not charging her management fees caused a significant drop in the total management fees collected by Fernbank Partners in 2014.

23. Under the Fernbank Partners' and Fund's Operating Agreements, Mr. Tabatabai was not legally permitted to stop charging a member management fees without the explicit consent of his co-manager, Mr. Pauls, which Mr. Tabatabai never obtained. Mr. Tabatabai knew that he would not obtain such consent from Mr. Pauls because the management fees and incentive allocations that Mr. Pauls earned through his ownership interest in Fernbank Partners constituted Mr. Pauls' entire income, and Mr. Tabatabai was well aware that Mr. Pauls could not afford any reduction in that income at that time.

[1] For example, in December 2014, the Fund's administrator had calculated the Fund's 2014 return alone at over 84%.

24. On October 1, 2014, Mr. Pauls learned from Mr. Tabatabai for the first time that Fernbank Partners had not been receiving management fees from Cindy Kaiser's Fund capital account. Mr. Pauls correctly accused Mr. Tabatabai of having given his wife preferential treatment behind Mr. Pauls' back and to Mr. Pauls' financial detriment.

25. Immediately thereafter, Mr. Tabatabai began to invent and accuse Mr. Pauls of various fabricated accounting and bank irregularities in retaliation for the legitimate concerns that Mr. Pauls had raised regarding Ms. Kaiser's management fees.

26. Meanwhile, Mr. Pauls asked the Fund administrator to calculate the amount of the fees owed to Mr. Pauls from Ms. Kaiser's account for the first three quarters of 2014. The administrator conservatively estimated the amount to be $13,000. On October 10, 2014, Mr. Pauls directed the Fund to wire that amount to his banking account as payment for the outstanding management fees owed.

27. Sometime shortly thereafter, Mr. Tabatabai learned that Mr. Pauls had charged his wife, Ms. Kaiser, the $13,000 in management fees that she owed him. In response, Mr. Tabatabai lost his mind. Ms. Kaiser was contractually obligated to pay this management fee like every other member of the Fund. Moreover, Mr. Pauls had, in 2013, earned Ms. Kaiser over $400,000 in returns and was in process of earning Ms. Kaiser over $1,000,000 in returns for 2014. Still, as alleged below, Mr. Tabatabai felt that the loss of $13,000 that was actually owed to Mr. Pauls was worth ruining the lives and careers of both Mr. Pauls and Mr. Tabatabai, destroying the business that they had built together and, ultimately, thanks to the faithless efforts of Defendant Poppiti, wiping out millions in capital owed to the Fund's creditors and members. Thus, upon learning of Mr. Pauls' payment of this amount that he was owed, Mr. Tabatabai set out on a vindictive crusade to destroy Mr. Pauls.

28. To start, on October 16, 2014, Mr. Tabatabai, without Mr. Pauls' knowledge or consent, purportedly resolved by himself and on behalf of Fernbank Partners to remove Mr. Pauls as manager for "cause" pursuant to the Fernbank Partners Operating Agreement.

29. On October 21, 2014, Mr. Tabatabai, also without Mr. Pauls' knowledge or consent, issued a "Special Notice" to Fund investors declaring that he had removed Mr. Pauls "for cause" because "he directed a wire of $13,000 from one of the Fund's brokerage accounts to his personal account on October 10, 2014 without following proper procedures."

30. The Special Notice also indicated that Mr. Pauls purported removal had triggered Fund members "Special Withdrawal Rights" under the Fund Operating Agreement – in essence forcing the wind down and liquidation of the Fund.

31. As an important aside, the timing of Mr. Tabatabai's illegal action could not have been worse for the Fund and its members. At the end of 2014, the vast majority of the Fund's assets were invested at Mr. Pauls direction in approximately 5.8 million shares representing more than 12% of a Canadian medical supply company called CRH Medical. Mr. Pauls also obtained a seat on the company's board of directors and had helped shepherd a merger slated to take place at the close of 2014. As a result of this corporate action and another corporate action in early 2015, CRH Medical's stock price more than tripled. Because of Mr. Tabatabai's illegal dismissal of Mr. Pauls and subsequent liquidation of the Fund, Fund members missed out on at least $20 million dollars in additional returns that Mr. Pauls had worked hard to earn them.

32. After foolishly and hastily dumping the Fund's CRH Medical holding and foregoing these massive gains, Mr. Tabatabai, for good measure, then also lost another 20% of the Fund's assets through subsequent bad investments while he was in sole control between October 2014 and the appointment of Defendant Poppiti as liquidating trustee in August 2015.

**C. Appointment Of The Defendant As Liquidating Trustee**

33. As part of Mr. Tabatabai's vendetta, he filed a baseless arbitration claim against Mr. Pauls with the American Arbitration Association (the "Arbitration").

34. The Arbitration was conducted in Washington DC between 2015 and 2017.

35. Mr. Tabatabai had purported to bring the action on behalf of Fernbank Partners and the Fund. As an initial matter, Mr. Pauls challenged whether his purported removal had been legal under the Operating Agreements and thus whether Mr. Tabatabai had authority on his own to direct the actions of Fernbank Partners and/or the Fund.

36. The arbitrator issued a Partial Award on July 9, 2015 that determined Mr. Tabatabai's purported removal of Mr. Pauls from his management position at Fernbank Partners had violated the express provisions of the Fernbank Partners Operating Agreement and was thus *void ad initio.*

37. At Mr. Pauls' urging, the arbitrator also determined under Delaware Code § 18-802 that is was not reasonably practicable for Mr. Pauls and Mr. Tabatabai to continue to carry on the business of Fernbank Partners in conformity with the Fernbank Partners' Operating Agreement and that, therefore, he would appoint a liquidating trustee to wind down Fernbank Partners' affairs.

38. Pursuant to an email order dated August 6, 2015, the arbitrator appointed Defendant Poppiti to act as liquidating trustee for Fernbank Partners.

39. Vincent Poppiti is a retired Delaware family law court judge. He is a partner in the Delaware office of the law firm Fox Rothschild LLP. He has no professional experience in hedge fund law or accounting. Nor does Defendant Poppiti have any professional experience in matters involving the duties or responsibilities owed by investment managers to the private funds for which they perform services. Nor does Defendant Poppiti have any experience liquidating or otherwise managing or dissolving an investment management company or a private fund. He does not have any professional experience in auditing or accounting practices or securities regulation. According to his CV, Defendant Poppiti, in addition to family law issues, only has experience in patent and anti-trust matters.

40. While the parties to the Arbitration were asked whether they had any conflicts with regard to Defendant Poppiti's appointment, they were not otherwise given any input into the selection made by the arbitrator of the liquidating trustee.

41. Pursuant to a letter dated August 7, 2015, Defendant Poppiti accepted appointment as liquidating trustee for Fernbank Partners. In that same letter, Defendant Poppiti, without consulting either Mr. Pauls or Mr. Tabatabai, *designated himself* to act as liquidating trustee for the Fund.

42. At the time of Defendant Poppiti's appointment as liquidating trustee, Fernbank Partners had no assets other than accounts receivable from the Fund in the form of unpaid management fees, incentive allocations, and legal fees and expenses owed to Mr. Pauls. It also had malpractice and other claims against the lawyers hired by Mr. Tabatabai to assist him in illegally removing Mr. Pauls and to represent Fernbank Partners and pursue claims against Mr. Pauls, Douglas MacLean and Jeffrey Cohen. The Fund, on the other hand, had approximately $3 million in cash and other assets.

43. Simultaneously with his appointment, Defendant Poppiti hired his law firm, Fox Rothschild LLP to represent himself and purportedly the two Fernbank entities during the course of the liquidation and arbitration. Mr. Poppiti and his law firm have thus far charged this small Fund well over a $1.5 million, and likely closer to $2 million, of the $3 million they were entrusted with, for their services to date.

44. There is not a single Fund investor that will recover in liquidation from the Fund even a small fraction of the amount of money that Defendant Poppiti has managed to make off with for himself and his law firm. Indeed, *the entire Fund* will recover in liquidation significantly less money than Defendant Poppiti managed to bilk out of this engagement.

45. By any measure, the liquidation of the Fund has been a financial disaster and a complete waste for everyone but the trustee. Defendant Poppiti appointed himself trustee of an entity with less than $3 million in assets and has already spent well over $2 million liquidating it for the supposed benefit of its investors. Not one penny of that money has yet to be distributed to any of the Fund's investors. Instead, the vast majority has been paid to Defendant Poppiti and his law firm who continue to rack up fees at the expense of Fernbank Partners. When Defendant Poppiti completes the liquidation of

the Fund, it is doubtful there will be much, if any, money remaining to distribute to the Fund's beneficiaries. Defendant Poppiti has not "liquidated" the Fund, so much as he has squeezed dry that entity for the enrichment of himself, his law firm, and other professionals of his choosing.

**D. Defendant Poppiti Breached His Fiduciary Duties To Fernbank Partners**

46. Defendant Poppiti was initially appointed to be the liquidating trustee for Fernbank Partners, not the Fund. While Fox Rothschild attorneys were appointed to represent the interests of the Liquidating Trustee and the Fund, at least as far as Mr. Pauls can tell, there was not a single Fox Rothschild lawyer that represented the interests of Fernbank Partners.

47. Since day one of his appointment, Defendant Poppiti failed to take a single action for the benefit of Fernbank Partners or its sole beneficiaries, Mr. Pauls and Mr. Tabatabai. To the contrary, Defendant Poppiti and his team almost immediately, relying exclusively on false information fed to them by Mr. Tabatabai, incorrectly determined that Mr. Pauls was a crook and set about proving Mr. Tabatabai's wrongheaded claims in conflict with Defendant Poppiti's fiduciary duty. Thus, almost from the start, Defendant Poppiti was actively working against the interests of the owner of the company whose interests he has agreed to hold in trust.

48. If Defendant Poppiti believed that a principal of his initial trust, Fernbank Partners, might have engaged in conduct detrimental to his second trust, the Fund, he had an obvious conflict of interest and a clear ethical obligation. He was obligated to alleviate that conflict by doing something, for example appointing an independent successor trustee to justly and fairly represent the interest of Fernbank Partners. Instead, *no one* represented Fernbank Partners' interests, and Defendant Poppiti did everything he could to deprive and damage those interests to the greatest extent possible.

49. For example, on September 4, 2015, approximately one month after the appointment of Defendant Poppiti as liquidating trustee for Fernbank Partners, counsel for Mr. Pauls wrote to request: (i) partial payment of the incentive allocation due from the Fund to Fernbank Partners and then to Mr.

Pauls and (ii) payment of legal fees and expenses incurred by Mr. Pauls to date in the Arbitration – i.e. the legal fees that Mr. Pauls had expended successfully proving that his removal had been improper and petitioning the appointment of a liquidating trustee for Fernbank Partners (the "September 2015 Letter").

50. The September 2015 Letter explained that because of Mr. Tabatabai's wrongful removal of Mr. Pauls, he had not been paid the approximately $350,000 in incentive allocations that he was owed for 2014. It noted that the arbitrator's Partial Award had reinstated Mr. Pauls and empowered Defendant Poppiti to pay Mr. Pauls the amounts due him.

51. The September 2015 Letter further noted that Section 3.4 of the Fernbank Partners' Operating Agreement provided for indemnification of both managers and members of Fernbank Partners. Specifically:

> To the fullest extent permitted by law, and subject to the limitations set forth in this section, unless otherwise determined by the Managers: (a) the Company shall indemnify a Manager, Member or Officer ("Protected Parties" or each a "Protected Party") for the entirety or part of any Adverse Consequences[2] (including reasonable attorneys' fees) that a Protected Party may suffer including but not limited to, any such Protected Party who was, is or is threatening to be made a party to any threatened, pending or completed action, suit or proceeding ("Proceeding"), any appeal therein, or any inquiry or investigation preliminary thereto, solely by reason of the fact that he or she is or was a Protected Party and was acting within the scope of duties or under the authority of the Managers; (b) the Company shall pay, and advance or it the foregoing is not practicable, reimburse a Protected Party for expenses incurred by him or her (1) in advance of any disposition of a Proceeding to which such Protected Party was, is or is threatened to be made a Party, and (2) in connection with his or her appearance as a witness or other participation in any Proceeding.

52. The September 2015 Letter also noted that Section 9 of the IMA between Fernbank Partners and the Fund likewise provided for Mr. Pauls' indemnification:

> (a) None of the Investment Managers or any of its members, officers, or employees or any person controlling, controlled by or under common control with the Investment Manager (collectively, "Affiliates") or the legal representatives of any of them shall be liable to either of the Company for, and the Company shall indemnify such persons with respect

[2] Section 1.1 defines "Adverse Consequence" to "include all actions, suits, proceedings, hearings, investigations, charges, complaints, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, liens, losses, expenses, and fees, including court costs and reasonable attorney's fees and expenses."

> to, any cost or expense arising from mistakes in judgment or any action or inaction that the person reasonably believed to be in the best interest of the Company . . . . The Investment Manager and each Affiliate may consult with counsel and accountants in respect of the affairs of the Company and be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they shall have been selected with reasonable care.
>
> (b) The Company shall indemnify and hold harmless the Investment Manager, each Affiliate and the legal representatives of any of them (each, an "Indemnified Party"), from and against any loss or expense suffered or sustained by an Indemnified Party by reason of the fact that it is or was an Indemnified Party, including, without limitation, any judgment, settlement, reasonable attorney's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding (collectively, "Losses"), provided that such Losses did not result from the negligence, willful misfeasance or bad faith of an Indemnified Party and, in the case of criminal proceedings, the Indemnified Party had no reasonable cause to believe its action unlawful. The Company shall advance to any Indemnified Party reasonable attorney's fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct. In the event that such an advance is made by the Company, the Indemnified Party shall agree (or, if a party hereto, hereby agrees) to reimburse the Company for such fees, costs and expenses to the extent that it shall be determined that it was not entitled to indemnification under this Section 10(b).

53. Likewise, Section 2.06 of the Fund Operating Agreement provides:

> To the fullest extent permitted by law, the [Fund] shall indemnify and hold harmless [Fernbank Partners], Affiliates and the legal representatives of any of them (an "Indemnified Party") from and against any loss or expense suffered or sustained by an Indemnified Party by reason of the fact that it is or was an Indemnified Party, including, without limitation, any judgment, settlement, reasonable attorney's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding, provided that such loss or expense resulted from a mistake of judgment on the part of the Indemnified Party, or from action or inaction that said Indemnified Party reasonably believed to be in the best interests of the [Fund] or for losses due to the negligence, dishonesty or bad faith of any employee, broker, or other agent of any Indemnified Party provided that such employee, broker or agent was selected engaged or retained by the Indemnified Party with reasonable care. The [Fund] shall, in the sole discretion of [Fernbank Partners], advance to any Indemnified Party reasonable attorney's fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct.

54. By letter dated September 25, 2015, counsel for Defendant Poppiti responded and vehemently refused payment of either of these sums contractually owed to Mr. Pauls (the "September 25, 2015 Letter"). In denying payment of the incentive allocation by Fund to Mr. Pauls via Fernbank Partners, Defendant Poppiti was directly advocating against and impeding the payment of money owed to his trust Fernbank Partners and its owner. There cannot be a more blatant breach of fiduciary duty. A reasonable person in the conduct of his or her own affairs does not advocate for the nonpayment of monies owed to them. Nor does a faithful trustee argue against the payment of fees contractually owed to his beneficiary without breaching the care and loyalty demanded by law and equity.

55. Similarly, as to the issue of indemnification and advancement of fees, Defendant Poppiti took the position that it was within his discretion whether to provide indemnity or advancement under the contractual provisions of the Fernbank Partners' and Fund's Operating Agreements. This was another breach of Defendant Poppiti's fiduciary duty, exercising his discretion in favor of the interests of some other entity or persons – i.e. either the Fund and its members or Defendant Poppiti and his law firm – over Fernbank Partners and its principals Mr. Pauls and Mr. Tabatabai. He refused to expend Fund money – Fund money that was earned entirely through Mr. Pauls' investment management skills and effort, and that was, at that moment, being funneled steadily into the coffers of Defendant Poppiti's law firm – to satisfy the contractual obligations owed to the entity and individuals to whom Defendant Poppiti owed explicit fiduciary duties.

56. For good measure, Defendant Poppiti's September 25, 2015 Letter also baselessly defames his beneficiary. Even though he is a little over a month on the job and his letter repeatedly acknowledges that Defendant Poppiti's understanding of the Fund's financials at this point was nothing more than "mere guesswork" because none of the extensive audit work to be done by Sandler & Co had even started, Defendant Poppiti nonetheless repeatedly violated his duty of loyalty by baselessly parroting Mr. Tabatabai's obviously false allegations that Mr. Pauls stole money from the Fund. These

outrageous allegations made against his own beneficiary, without any basis or investigation, were again a blaring conflict of interest that required Defendant Poppiti's immediate recusal.

57. As a result of Defendant Poppiti's intervention in opposition to the request of his beneficiary Mr. Pauls, on October 6, 2015, the arbitrator denied without prejudice Mr. Pauls' request for payment of Fernbank Partner's incentive allocation and indemnification.

58. On multiple occasions thereafter during the arbitration Defendant Poppiti successfully opposed Fernbank Partners' and Mr. Pauls' indemnity rights in direct violation of the fiduciary duty that Defendant Poppiti owed as Fernbank Partners' trustee. In deference to Defendant Poppiti, the arbitrator denied Mr. Pauls' repeated requests for advancement of legal fees and expenses without prejudice throughout the arbitration.

59. But for the liquidating trustee's improper opposition to Mr. Pauls' request, Mr. Pauls would have received the incentive allocation owed to him along with indemnification and advancement of his fees. Thus, as a direct result of Defendant Poppiti's breach of fiduciary duty, Mr. Pauls was denied not only substantial sums of money, but also was denied the legal defense to which he was contractually entitled. Defendant Poppiti intentionally, and in bad faith, obstructed Mr. Pauls' ability to defend himself in the arbitration in violation of the fiduciary duties Defendant Poppiti owed Mr. Pauls.

**E. Defendant Poppiti's Expert Proved Mr. Pauls' Innocence**

60. Defendant Poppiti hired Sandler & Co, a national accounting firm, to reconstruct from scratch the financial records of both Fernbank Partners and the Fund under the supervision of Defendant Poppiti's law firm. This project was undertaken by the trustee so as to generate the maximum possible fees for Defendant Poppiti's firm.

61. From the moment of Defendant Poppiti's appointment, Mr. Pauls repeatedly offered to assist Sandler & Co with its efforts to understand the complex records that Mr. Pauls had kept, and later to reconstruct the new financial records ordered by the Trustee so as to reduce the cost and time of such

an undertaking. However, Mr. Pauls' offers were repeatedly and vociferously rejected. For example, after repeated offers to go over Mr. Pauls' books and records with Sandler & Co., counsel for Defendant Poppiti responded, "The bookkeeping services of [Mr. Pauls are] not required . . . . To our knowledge we are in a position to determine when funds were deposited and when funds were withdrawn without the assistance of [Mr. Pauls]."

62. Ultimately, after over six months and the expenditure of massive amounts of Fund money, Defendant Poppiti produced Financial Reports for Fernbank Partners and the Fund in or around April 2016 (the "Financial Reports"). According to the Financial Reports prepared by Defendant Poppiti's own expert, the Fund owed Fernbank Partners $225,327 in unpaid management fees and incentive allocations.

63. In recreating the financials, Poppiti directed Sandler to use accounting procedures that were not actually used by Fernbank Partners or its administrator while the fund was active. Instead, these different procedures were far more favorable to the Fund and were to the detriment of Fernbank Partners. The adoption of these procedures led to Sandler understating the management fees and incentive allocations owed to Fernbank Partners by several hundred thousand dollars.

64. Defendant Poppiti refused to pay any amount to the entity for which he was supposedly acting as trustee, Fernbank Partners, or its owners Mr. Pauls or Mr. Tabatabai. Instead, Defendant Poppiti, in direct contravention of his fiduciary duty, again worked against the interest of Fernbank Partners, defied the findings of his own expert, and successfully argued that Fernbank Partners and its owners were not entitled to payment of any management fees or incentive allocations from the Fund.

65. Had anyone advocated on behalf of Fernbank Partners, the result would have been different. But because no one did, the Arbitrator deferred to Defendant Poppiti, and Mr. Pauls was deprived of the funds to which even Defendant Poppiti's own expert argued he was due because of the faithless acts of his company's trustee.

**F. Defendant Poppiti Sued His Own Beneficiary In Breach Of His Fiduciary Duty**

66. On August 15, 2016, several months after Defendant Poppiti's own expert concluded that Mr. Pauls had not committed any wrongdoing and was, in fact, owed money by the Fund, Defendant Poppiti nevertheless amended the Demand for Arbitration to assert claims against Mr. Pauls in contradiction to his own's expert's finding and in direct breach of the fiduciary duties that Defendant Poppiti owed Mr. Pauls (the "Amended Demand").

67. The Amended Demand falsely alleged, for example, that Fernbank Partners was paid excess management and incentive fees that were then distributed to Mr. Pauls and Mr. Tabatabai. In other words, Defendant Poppiti brought suit alleging that the entity for which he was supposedly acting as trustee, Fernbank Partners, stole money from another entity, the Fund, for which he had also appointed himself trustee and from which he was actively paying himself large sums of money.

68. Upon information and belief, the reason that Defendant Poppiti sued Mr. Pauls rather than pay him the amounts his own expert found due and owing is because some of the Fund's investors, at the direction of Mr. Tabatabai and financed by Mr. Tabatabai, filed a lawsuit in Delaware Chancery Court alleging that Defendant Poppiti, had failed in in his role of trustee of the Fund to sufficiently protect the interests of investors and had a conflict of interest. The sole purpose of the suit was to improperly influence Defendant Poppiti, and it worked. He was pressured and influenced by this suit, and to protect his own hide, Defendant Poppiti refused to pay the amounts due to Fernbank Partners in thinly-veiled attempt to placate those investors and limit his own litigation exposure. By putting his own self-interest ahead of that of Fernbank Partners, Defendant Poppiti violated his fiduciary duties to Fernbank Partners.

**G. Defendant Poppiti Committed Further Breaches During And After Trial**

69. During the arbitration hearing, Defendant Poppiti took the stand and gave unsubstantiated testimony in further breach of his fiduciary duty. First, Defendant Poppiti testified that he had no

personal knowledge of the underlying facts of the case or any of the work that had been done by Sandler & Co to reconstruct the financials. He admitted that his knowledge was limited to the "hand-holding" walk through that his expert had done of the Financial Report just prior to his testimony.

70. Nonetheless, Defendant Poppiti testified, after coordinating with counsel for Mr. Tabatabai, and without any basis whatsoever, that he believed that Mr. Pauls "took funds that I believe he should not have taken at the time he took them." In other words, Defendant Poppiti, while supposedly acting as trustee for Mr. Pauls' company, Fernbank Partners, baselessly accused Mr. Pauls of using that company to steal money from the Fund. Again, it is hard to imagine a more blatant conflict of interest or flagrant breach of fiduciary duty by a trustee than to voluntarily testify against that beneficiary and baselessly accuse them of thievery.

71. In his post-hearing brief, Defendant Poppiti argued that neither Fernbank Partners nor Mr. Pauls was entitled to indemnity under the Operating Agreements because Defendant Poppiti had determined they were not entitled to indemnity. Defendant Poppiti argued that his arbitrary determination, in direct violation of the fiduciary duty he owed to maximize the recovery of Fernbank Partners and Mr. Pauls, was determinative under the language of the Operating Agreements.

72. Defendant Poppiti also argued that Fernbank Partners and Mr. Pauls were not entitled to indemnity because, again according to the determination of their fiduciary, they had allegedly breached the fiduciary duties that they owed to the Fund. It is outrageous that Defendant Poppiti alleged that the entity and person to whom he owed a fiduciary duty of loyalty were not entitled to contractually owed funds because their fiduciary was baselessly accusing them of wrongdoing.

### H. As A Result Of Defendant Poppiti's Breaches Of His Fiduciary Duties, Mr. Pauls Has Been Financially And Reputationally Ruined.

73. Mr. Pauls was never afforded the contractually guaranteed resources necessary to defend himself and instead he was railroaded in an Arbitration that has left him financially and reputationally

ruined. All the while, Defendant Poppiti and his law firm collected well over $1.5 million dollars of the money generated by Mr. Pauls' skill.

74. As a result of the biased and improper positions taken and asserted by Defendant in violation of his fiduciary, the arbitrator ordered, without any legal or contractual basis, that Fernbank Partners forfeit all of the management fees and incentive allocations that Defendant Poppiti's own expert had determined it was owed. Thus, again, Defendant Poppiti had successful deprived Fernbank Partners, for whom he was supposedly acting as trustee, over $225,000.

75. Additionally, the arbitrator granted Defendant Poppiti's request to deny Fernbank Partners and Mr. Pauls request for indemnity. Defendant Poppiti thereby successfully denied his beneficiaries over a $1 million in legal fees and expenses to which they were contractually owed.

76. But for the Liquidating Trustee's failure to advocate in any way for Fernbank Partners or its owners, the arbitrator would have ruled in Mr. Pauls' favor.

77. In a March 3, 2017 letter to Fund investors, Defendant Poppiti touted the success he achieved in denying incentive fees and indemnification to his first trust, Fernbank Partners:

> Without the Final Award, the former managers would have been entitled to receive payment of fees and allocations upon a final liquidation. The forfeiture of incentive and management compensation, the denial of the right to indemnification, and the clawback of compensation previously paid to the former managers, will ultimately allow the net cash in the Fund, as well as any additional amounts recovered from Mr. Tabatabai, to be distributed to the Fund's investors, instead of going to Mr. Pauls or Mr. Tabatabai.

**I. The Liquidating Trustee Failed to Bring Any Other Claims On Behalf of Fernbank Partners**

78. While Defendant Poppiti was happy to bring claims against Fernbank Partners, and gloat to Fund investors about his success in so doing, he failed to bring any claims on behalf of Fernbank Partners. In addition to not bringing the claims against the Fund for indemnification, management fees and incentive allocations detailed above, Defendant Poppiti also failed to bring claims against the

Fernbank Partners' attorneys who, along with Mr. Tabatabai, are responsible for this debacle: Douglas MacLean and Jeffrey Cohen.

79. Douglas MacLean was secretly hired by Mr. Tabatabai without Mr. Pauls' knowledge or consent to represent Fernbank Partners and conspired with Mr. Tabatabai to illegally throw Mr. Pauls out of control of Fernbank Partners in October 2014. Fernbank Partners has clear claims against Mr. MacLean for malpractice and breach of fiduciary duty among other things. Not only did Defendant Poppiti not pursue these claims, he instead used Fund assets to pay all of Mr. MacLean's legal bills, including for all of the time that Mr. MacLean spent prosecuting claims against Mr. Pauls even after the arbitrator issued the Partial Award finding that his continued representation of the Fund was illegal.

80. To make matters even worse, Defendant Poppiti inexplicably retained and paid Mr. MacLean, the Fernbank Partners attorney who was the architect of the illegal scheme to remove Mr. Pauls from control of Fernbank Partners, *to assist him and provide him advice on behalf of Fernbank against Fernbank Partners.* It is difficult to imagine a more blatant and impermissible conflict of interest.

81. Nor did Defendant Poppiti bring any claims against another Fernbank Partners' attorney Jeffrey Cohen. Mr. Cohen was illegally hired by Mr. Tabatabai to pursue claims on behalf of Fernbank Partners against Mr. Pauls, and like Mr. MacLean, illegally continued to represent Fernbank Partners after the Partial Award said he could not. Again, rather than seek a return of the fees illegally paid to Mr. Cohen by Mr. Tabatabai, or seek damages for the illegal and incompetent advice he provided Fernbank Partners, Defendant Poppiti paid all of Mr. Cohen's fees, *and instructed his expert to charge half of those fees against Mr. Pauls' account.* In other words, Defendant Poppiti charged Mr. Pauls tens of thousands of dollars to pay for the attorney that Mr. Tabatabai illegally hired to represent Fernbank Partners to pursue claims against Mr. Pauls.

82. Moreover, Defendant Poppiti retained Mr. Cohen to attempt to fraudulently and illegally extort a settlement from another Fund investor, Mr. Kamyans, who Mr. Tabatabai had falsely claimed assisted Mr. Pauls. Mr. Cohen tried to shake down Mr. Kamyans by telling his attorney that he had authority to file a lawsuit against Mr. Kamyans on behalf of the Liquidating Trustee, when he had been explicitly told he had no such authority. When this was pointed out Defendant Poppiti, rather than take any action against Mr. Cohen for his illegal and fraudulent conduct, Defendant Poppiti instead continued paying his bills with Fund assets and continued to employ him.

## CAUSES OF ACTION

### Count I – For Breach of Fiduciary Duty

83. The allegations in paragraphs 1 through 82 are realleged and incorporated herein.

84. Defendant Poppiti knowingly agreed to act as liquidating trustee for Fernbank Partners.

85. Defendant Poppiti on numerous occasions purported to be the liquidating trustee of Fernbank Partners.

86. As liquidating trustee, Defendant Poppiti owed Fernbank Partners fiduciary duties of, among others, care and loyalty.

87. As Fernbank Partner's liquidating trustee, Defendant Poppiti also owed that entity's member, and 50% owner, Mr. Pauls, fiduciary duties of, among others, care and loyalty.

88. Defendant Poppiti repeatedly breached the fiduciary duties he owed to Fernbank Partners and Mr. Pauls by, among other things:

a. Failing to act in good faith to carry out his duties as liquidating trustee of Fernbank Partners;

b. Failing to exercise the care of an ordinarily prudent person in like positions and in a manner he believed to be in the best interests of Fernbank Partners and/or Mr. Pauls;

c. Failing to act in the best interest of Fernbank Partners and/or Mr. Pauls;

d. Acting adverse, contrary, and in conflict to the best interests of Fernbank Partners and/or Mr. Pauls;

e. Failing to use best efforts on behalf of the interests of Fernbank Partners and/or Mr. Pauls;

f. Acting in his own interests to the detriment of the interests of Fernbank Partners and/or Mr. Pauls;

g. Obtaining personal benefits at the expense of Fernbank Partners and/or Mr. Pauls;

h. Failing to administer the trust solely in the interest of Fernbank Partners and its owners;

i. Failing to fully disclose material facts when dealing for his own account;

j. Failing to keep and render clear and accurate accounts of the administration of the trust;

k. Failing to take reasonable steps to take, keep control of, and preserve the trust's property;

l. Misappropriation of trust's funds;

m. Failure to exercise independent judgment;

n. Self-dealing; and

o. Neglect, imprudence, and want of skill.

89. Defendant Poppiti's breach of the fiduciary duties that he owed to Fernbank Partners and to Mr. Pauls has caused damages to Mr. Pauls in an amount to be proven at trial, but which exceeds $1 million.

90. Defendant Poppiti's tortious misconduct was done intentionally, and willfully. It displayed a conscious desire to cause Mr. Pauls harm, or at a minimum, a callous and reckless indifference to that apparent probability.

**Count II – Appointment of Replacement Liquidating Trustee for Fernbank Partners**

91. The allegations in paragraphs 1 through 90 are realleged and incorporated herein.

92. In the alternative, because of the blatant and glaring conflict of interest, the Court should remove Defendant Poppiti as Liquidating Trustee for Fernbank Partners, and appoint a successor Liquidating Trustee, pursuant to 6 Del. C. §§ 18-802 or 18-803, to pursue the claims on behalf of Fernbank Partners detailed above, including claims against Defendant Poppiti for breach of fiduciary duty.

WHEREFORE, Plaintiff Matthew Pauls respectfully demands the following:

Civil damages in the amount to be proven at trial, but in excess of $1 million;

punitive damages in an amount to be proven at trial, but in excess of $1 million;

attorney's fees and expenses expended by Mr. Pauls in the Arbitration in an amount to be proven at trial, but in excess of $1 million; and

the attorney's fees and expenses Mr. Pauls incurs in the present action; and such other relief as the Court should deem fair and just.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

Dated: April 5, 2017

Respectfully submitted,

Steven K. Barentzen
LAW OFFICE OF STEVEN BARENTZEN
910 17th Street, NW, Suite 800
Washington, DC 20006
Tel: 202.289.4333
Fax: 202.888.6268
steven@barentzenlaw.com

*Counsel for Plaintiff Matthew Pauls*